IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------- )
OCEANA, INC.                             )
2501 M Street, NW                        )
Washington, DC  20037-1311               )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )          Civil Action No.  _____
                                         )
CARLOS M. GUTIERREZ, in his official     )
capacity as Secretary of the United States )
Department of Commerce,                  )
Office of the Secretary                  )
Room 5516                                )
14th Street and Constitution Ave., NW    )
Washington, DC 20230;                    )
                                         )
NATIONAL OCEANIC AND                     )
ATMOSPHERIC ADMINISTRATION               )
Department of Commerce                   )
Room 5128                                )
14th Street and Constitution Ave., NW    )
Washington, DC 20230; and                )
                                         )
NATIONAL MARINE FISHERIES SERVICE )
Department of Commerce                   )
Room 14555                               )
1315 East-West Highway                   )
Silver Spring, MD 20910                  )
                                         )
                    Defendants.          )
_____)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Scallop dredges catch and kill hundreds of threatened loggerhead sea turtles every

year.  The geographic range of the scallop fishery extends along the Atlantic coast from the

Canadian border south through the Mid-Atlantic.  Scallop dredge vessels fish year round.  The

dredges do not catch and kill loggerheads all the time nor do they kill loggerheads in every

geographic region of the fishery.  Instead, scallop dredges are known to catch loggerheads primarily in the Mid-Atlantic region of the fishery and primarily in the months of May through November.  Appropriately, defendants National Marine Fisheries Service, *et al.*, (the "agency" or "Fisheries Service") initiated a rulemaking to reduce the impacts of scallop dredging on loggerheads.

2.     On August 25, 2006, the agency promulgated a rule requiring vessels fishing for scallops with dredges in the Mid-Atlantic region to fit their dredges with "turtle chains."  71 Fed. Reg. 50361 (Aug. 25, 2006).  Turtle chains strike sea turtles and prevent them from being caught in the dredge, but do not reduce the number of times the dredge strikes sea turtles and may not reduce the number of times the dredge injures and kills sea turtles.  Accordingly, the Fisheries Service concedes that that this rule is unlikely to have a significant benefit to sea turtles.  Yet the Fisheries Service arbitrarily and irrationally chose to mandate turtle chains while rejecting an alternative that it conceded would benefit sea turtles:  prohibiting scallop dredging in the Mid-Atlantic region during the months when dredges catch and kill sea turtles.

3.     Furthermore, the agency's decision to mandate the use of turtle chains arbitrarily and irrationally undermines the agency's use of at-sea observers to monitor the impacts of scallop fishing on sea turtles by requiring a gear configuration that will prevent at-sea observers from detecting interactions with sea turtles while failing to consider or establish an alternative monitoring system.

4.     Oceana brings this lawsuit to compel the agency to reconsider its arbitrary and irrational analysis in this rulemaking and its accompanying Environmental Assessment and develop a new rule which will protect threatened loggerhead sea turtles from further unnecessary and avoidable harm.

**JURISDICTION AND VENUE**

5.      Oceana brings this action under provisions of the Endangered Species Act,

16 U.S.C. § 1533(d), the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

6.      The District Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws

. . . of the United States."

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

8.      The District Court may hold unlawful and set aside agency action pursuant to

5 U.S.C. § 706 and issue a declaratory judgment and any further necessary or proper relief

pursuant to 28 U.S.C. §§ 2201-2202.

**PARTIES**

9.      Plaintiff Oceana is a non-profit international advocacy organization dedicated to

protecting and restoring the world's oceans through policy, advocacy, science, law, and public

education.  Oceana has over 280,000 members and supporters around the world, including over

57,000 members and supporters in the coastal states from Maine to North Carolina.  Oceana is

organized under the laws of the District of Columbia, and maintains its headquarters in

Washington, DC.  It has offices or staff in five states (Alaska, California, Massachusetts, New

York, and Oregon) and three foreign countries (Chile, Belgium, and Spain).  Through its policy,

scientific, litigation, and grass-roots activities, Oceana has been a prominent advocate for

protecting threatened and endangered marine species (such as loggerhead sea turtles) and

promoting environmentally and economically sustainable fisheries.  Oceana has participated in

administrative proceedings before government agencies, litigated before courts, and issued

reports to the public, all in the service of protecting marine resources and wildlife.

10.     Oceana's members, supporters, staff, officers, and directors (hereinafter, "members") include fishermen, boaters, scientists, students, consumers, and citizens who use and enjoy the oceans for numerous activities, including fishing, scuba diving, snorkeling, boating, swimming, beach walking, research, and study.  Oceana's members value a healthy marine environment, including in the waters off the northeastern United States.  They are concerned about and directly affected by environmental injury caused by dirty fishing practices, including practices that catch and kill threatened loggerhead sea turtles.

11.     Oceana and its members suffer direct and immediate injury as a result of the agency's failure to protect loggerhead sea turtles.  Oceana's members participate in loggerhead sea turtle viewing opportunities, such as visiting sea turtle nesting sites, scuba diving, and snorkeling.  Oceana's members intend to continue to study, observe, and attempt to observe loggerhead sea turtles in the future.  They derive scientific, recreational, conservation, spiritual, and aesthetic benefits from the existence of loggerhead sea turtles in the wild.  These interests have been impaired by the agency's conduct and, unless the Court grants the relief requested herein, will continue to be impaired, as loggerhead sea turtles will continue to be killed and injured by scallop fishing in the Mid-Atlantic.

12.     Defendant Carlos M. Gutierrez is Secretary of the United States Department of Commerce.  He is sued in his official capacity as the chief officer of the federal agency charged by the United States Congress with protecting threatened and endangered species in the marine environment, including loggerhead sea turtles.

13.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary of Commerce has delegated responsibility for

protecting threatened and endangered species in the marine environment to NOAA, which in turn has sub-delegated that responsibility to the National Marine Fisheries Service.

14.    Defendant National Marine Fisheries Service is an agency of the United States Department of Commerce that has been delegated the primary responsibility to protect threatened and endangered species in the marine environment.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Endangered Species Act

15.    The Endangered Species Act, 16 U.S.C. §§ 1531-1544, has been described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  The Act reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species."  *Id.* at 185.

16.    Section 4 of the Endangered Species Act provides that the Secretary of Commerce is responsible for determining whether any marine species is threatened or endangered. 16 U.S.C. § 1533; *see also id.* § 1532(15) (defining the term "Secretary").  If the Secretary determines that a species is threatened or endangered, Section 4(d) authorizes him to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species." *Id.* § 1533(d).  The Secretary has delegated rulemaking authority under Section 4(d) to NOAA, which in turn has sub-delegated rulemaking authority to the Fisheries Service.  *See*, *e.g.,* 71 Fed. Reg. 50361 (Aug. 25) (rule promulgated by the Fisheries Service and NOAA pursuant to Section 4(d)).

17.    Section 9 of the Endangered Species Act and federal regulations implementing the Act provide that it is unlawful for any "person" to "take" a threatened or endangered species within the United States or the territorial sea of the United States or upon the high seas.

16 U.S.C. § 1538(a)(1)(B), (C); 50 C.F.R. §§ 17.21, 17.31.  Section 3 of the Act states that "[t]he

term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to

attempt to engage in any such conduct," and the term "person" includes, *inter alia*, "any officer,

employee, agent, department, or instrumentality of the Federal Government."  16 U.S.C.

§ 1532(13), (19).

18.     A federal agency is liable under Section 9 if it authorizes an activity that will

result in takes because "[t]he statute not only prohibits the acts of those parties that directly exact

the taking, but also bans those acts of a third party that bring about the acts exacting a taking."

*Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997).  Thus, "a governmental third party pursuant

to whose authority an actor directly exacts a taking of an endangered species may be deemed to

have violated the provisions of the [Endangered Species Act]."  *Id.*

19.     Sections 7(o)(2) of the Endangered Species Act allows a federal agency to

authorize incidental takes that would otherwise violate Section 9 of the Act, provided that the

agency follows the procedures set forth in Section 7(a) and complies with the resulting terms and

conditions.  16 U.S.C. § 1536(a), (o)(2).  Specifically, the agency proposing to authorize the

activity (the "action agency") must consult with the agency responsible for protecting the species

(the "expert agency") to insure that the proposed takes are "not likely to jeopardize the continued

existence of any endangered species or threatened species."  *Id.* § 1536(a)(2).  For federally-

authorized fishing activities affecting protected marine species, both the action and the expert

agency is the Fisheries Service.

20.     At the conclusion of the consultation, the expert agency issues a biological

opinion determining whether the proposed action is likely to jeopardize the continued existence

of the threatened or endangered species.  *Id.* § 1536(b)(3).

21.     If the expert agency finds "no jeopardy," the biological opinion will allow the proposed action to go forward subject to certain protections.  Specifically, pursuant to Section 7(b)(4), the biological opinion must include an incidental take statement specifying reasonable and prudent measures necessary to minimize the harm of any incidental takes, and terms and conditions necessary to implement the reasonable and prudent measures.  *Id.* § 1536(b)(4).

22.     If the action agency complies with the terms and conditions contained in the biological opinion, it may authorize the proposed activity without violating Section 9.  The agency is liable under Section 9, however, if it authorizes the proposed activity but fails to comply with any term and condition.  *Id.* § 1536(b)(4), (o)(2).

**B.     The National Environmental Policy Act**

23.     The National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f, "declares a broad national commitment to protecting and promoting environmental quality."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).  "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Id.* at 349.

24.     Accordingly, NEPA requires all federal agencies to prepare an environmental impact statement ("EIS") whenever they propose "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

25.     Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. Parts 1500-1508, provide federal agencies guidance in their task of complying with the NEPA.

26.     The CEQ's regulations mandate that the information developed through the NEPA process "must be of high quality."  40 C.F.R. § 1500.1(b).  Furthermore, the regulations

state that "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

27.     The CEQ's regulations require federal agencies, "to the fullest extent possible," to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." *Id.* § 1500.2.

28.     An EIS is the main vehicle for analysis of federal agency actions on the environment and consideration of reasonable alternatives that would avoid or minimize adverse impacts of those actions. *Id.* § 1502.1. "The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." *Id.*

29.     In determining whether to prepare an EIS, the agency may prepare an environmental assessment. *Id.* § 1501.4(a), (b).

30.     If the environmental assessment determines that the proposed action will have a significant effect on the quality of the human environment, the agency must prepare an EIS. *See id.* § 1508.13(a).

31.     If the environmental assessment determines that the proposed action will not have a significant effect on the quality of the human environment, the agency issues a finding of no significant impact ("FONSI") and is not required to prepare an EIS. *Id.* § 1501.4(e); *see also id.* § 1508.13 (defining "finding of no significant impact").

32.     The environmental assessment must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* § 1508.9.

33.     The environmental assessment must include "discussions of the need for the proposal, of alternatives [to the proposal, and] . . . of the environmental impacts of the proposed action and alternatives . . ."  *Id.* § 1508.9.

##### C.     The Administrative Procedure Act

34.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  *Id.* § 704.

35.     In an APA suit, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence . . ."  *Id.* § 706(2).

### FACTUAL AND REGULATORY BACKGROUND

#### I.     SCALLOP DREDGE VESSELS CATCH AND KILL SEA TURTLES THAT ARE PROTECTED BY THE ENDANGERED SPECIES ACT

36.     Vessels in the Atlantic Sea Scallop Fishery fish year round for scallops in the waters off the Atlantic Coast of the United States, from Maine to North Carolina.  Fisheries Service, *Final Environmental Assessment and Regulatory Impact Review Regulatory Flexibility Act Analysis of Sea Turtle Conservation Measures for the Mid-Atlantic Sea Scallop Dredge Fishery* 51 (April 2006) (the "Environmental Assessment" or "EA").

37.     While scallop vessels use both trawl and dredge gear, the overwhelming majority of scallops are caught using dredge gear.  EA at 12, 51.  Scallop dredge fishing vessels generally use two 15-foot dredges, consisting of a frame, bail, chain bag, and club stick.  *Id.* at 51.  The

frame "includes a sloping pressure plate to keep the dredge on the bottom and a cutting bar that lifts the scallops from the bottom by hydraulic action." *Id.* The bail "forms the mouth and the towing apparatus, ending forward with an upturned nose and roller." *Id.* The chain bag "is made of steel rings and terminates in a rigid club stick used to dump the contents on board." *Id.* A standard 15-foot dredge, including frame, bail, chain bag, and club stick, weighs about 4500 pounds. *Id.* at 51-52. Scallop dredges "are towed at speeds of 4 to 5 knots." *Id.* at 52.

38.    Scallop dredges catch hundreds of sea turtles every year. *Id.* at 8, 18-19, 22, 60-63. Most of the documented takes in this fishery are of loggerhead sea turtles, but other species of sea turtles are occasionally caught. *Id.* at 9, 14-17. All sea turtles found in United States waters are listed as either endangered or threatened under the Endangered Species Act. *Id.* at 8.

39.    The loggerhead sea turtle was listed as threatened throughout its global range on July 28, 1978. 50 C.F.R. § 17.11. Adult loggerheads are reddish brown to yellow in color with a large head, weigh up to 500 pounds, and are up to 4 feet long**.** U.S. Fish and Wildlife Service, *Recovery Plan for U.S. Population of Loggerhead Turtle* 1 (June 1993). Within the United States waters of the Atlantic and Gulf of Mexico, loggerheads are found from Maine to Texas. *Id.* They have major nesting populations on the coasts of North Carolina, South Carolina, Georgia, and Florida. *Id.*; EA at 36. Loggerheads are long-lived species and reach maturity when they are roughly 20 to 38 years old. EA at 39. They face significant threats to their nesting habitat on beaches and in the marine environment, including threats from commercial fishing. *Id.* at 43-44.

40.    On December 15, 2004, the Fisheries Service issued a Biological Opinion for the Atlantic Sea Scallop Fishery. Fisheries Service, *Atlantic Sea Scallop Biological Opinion* (Dec. 15, 2004) (the "Biological Opinion" or "BiOp"). The Biological Opinion is predicated on a

finding by the agency that takes of sea turtles must be monitored and that, if the number of takes is excessive, the agency must reinitiate consultation pursuant to Section 7(a)(2) of the Endangered Species Act. BiOp at 80-82. Recognizing that at-sea observers are the most reliable means for monitoring takes of sea turtles, the terms and conditions contained in the Biological Opinion require the Fisheries Service to deploy at-sea observers to obtain data on sea turtle takes and then to use that data to monitor and estimate the take of sea turtles by the fishery. *Id.* at 80-81. Furthermore, the terms and conditions provide that if the take estimate exceeds a threshold specified in the Biological Opinion, the Fisheries Service must reinitiate consultation. *Id.* at 82.

41.     Subject to the terms and conditions of the Biological Opinion, "[e]xisting sea turtle conservation regulations at 50 CFR 223.206(d) exempt fishing activities and scientific research from the prohibition on takes of threatened sea turtles . . ." EA at 13. This exemption, however, "does not authorize incidental takings during fishing activities if the takings . . . [w]ould violate the restrictions, terms, or conditions of an incidental take statement or biological opinion." 50 C.F.R. § 223.206(d)(4)(i).

## II.     THE FISHERIES SERVICE DEVELOPED THE "TURTLE CHAINS" RULE FOR THE STATED OBJECTIVE OF PROTECTING SEA TURTLES

42.     On June 17, 2004, the Fisheries Survival Fund and the Garden State Seafood Association submitted to the Fisheries Service an emergency petition urging the agency to adopt a rule pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1883, requiring vessels operating in the Mid-Atlantic region of the Atlantic Sea Scallop Fishery from May 1 through October 15 each year to use dredges modified with "turtle chains." 69 Fed. Reg. 63498, 63498 (Nov. 2, 2004). Turtle chains consist of a series of chains stretched horizontally and vertically across the mouth of the dredge to prevent sea turtles from entering the dredge and being caught. *Id.*; EA at 19. The agency rejected the petition on the ground that the

Magnuson-Stevens Act did not provide sufficient legal authority for the agency to issue such a rule. 69 Fed. Reg. at 63498. The agency said, however, that it would initiate a rulemaking to evaluate the possibility of issuing essentially the same rule pursuant to the Endangered Species Act. *Id.*

43. On May 27, 2005, the Fisheries Service issued a notice of proposed rulemaking pursuant to Section 4(d) of the Endangered Species Act for the stated objective of protecting sea turtles from scallop dredge fishing. 70 Fed. Reg. 30660 (May 27, 2005).

44. The agency stated that its preferred alternative for protecting sea turtles was a rule requiring scallop dredges used in the fishery from May through November each year to be equipped with turtle chains, but it also said that it was considering other approaches for protecting sea turtles including a seasonal closure of the fishery in the Mid-Atlantic region. *Id.* at 30664.

45. The agency has admitted that a seasonal closure is the best alternative for protecting sea turtles from scallop dredge fishing. EA at 87, 92, 116.

46. In conjunction with issuing its notice of proposed rulemaking, and pursuant to its obligations under NEPA, the agency issued a draft environmental assessment. Fisheries Service, *Draft Environmental Assessment and Regulatory Impact Review Regulatory Flexibility Act Analysis of Sea Turtle Conservation Measures for the Mid-Atlantic Sea Scallop Dredge Fishery* (Mar. 2005) ("Draft EA").

47. The Draft EA contained a draft FONSI based on the agency's preliminary determination that the turtle chains rule would not significantly affect the quality of the human environment. Draft EA at 104-106. Accordingly, the agency concluded that it was not required to prepare an EIS for the proposed rule. *Id.* at 106.

48.     Oceana submitted comments on the proposed rule and Draft EA by letters dated June 24, 2005 and September 6, 2005.  *See* Letter from Eric A. Bilsky, Oceana, to Mary A. Colligan, Fisheries Service (June 24, 2005) ("Oceana Comments"); Letter from Christopher J. Zeman, Oceana, to Mary A. Colligan (Sept. 6, 2005).  Oceana's comments raised the factual and legal concerns described herein, as well as other concerns.

49.     On August 25, 2006, exercising its rulemaking authority under Section 4(d) of the Endangered Species Act, the Fisheries Service adopted its preferred alternative, the turtle chains rule.  71 Fed. Reg. 50361 (Aug. 25, 2006).  In conjunction with issuing its final rule, the agency issued a final environmental assessment.  Like the Draft EA, the final EA contained a FONSI based on the agency's determination that the turtle chains rule would not significantly affect the quality of the human environment.  EA at 121-128.  Accordingly, the agency concluded that it was not required to prepare an EIS for the proposed rule.  *Id.* at 128.

50.     The turtle chains rule will become effective on September 25, 2006.  71 Fed. Reg. at 50361.

## III.  THE FISHERIES SERVICE'S DECISION TO ADOPT THE TURTLE CHAINS RULE WAS IRRATIONAL

51.     The agency's Environmental Assessment, its FONSI, and its decision to adopt the turtle chains rule rather than a seasonal closure were irrational.

### A.     The Agency Has No Direct Information about How Sea Turtles Interact Underwater with Sea Scallop Dredges with or without Turtle Chains

52.     The agency does not know how sea turtles interact underwater with scallop dredges and therefore has no idea whether turtle chains offer any benefit to sea turtles whatsoever.  *See* Oceana Comments at 4-5.

53.     The scallop industry and the agency conducted a preliminary trial in 2002, and field studies in 2003-2004, to determine the effects of turtle chains.  EA at 19.  The researchers

who conducted these experiments attempted underwater observations only once and did not observe any interaction with sea turtles. *Id.* at 19-21.

54. All of the agency's "analysis" and conclusions about how sea turtles interact underwater with turtle chains is really mere speculation. *See id.* at 59-66.

55. Indeed, the agency admits that it does not have any evidence about how sea turtles interact underwater with turtle chains. *Id.* at 62, 106, and 126; Draft EA at 36, 91.

56. The agency made a few minor attempts to document underwater interactions between scallop dredges and live sea turtles, but did not succeed in documenting any interactions. EA at 20, 62.

57. The agency does not purport to base its rule on any underwater observations of live sea turtles interacting with scallop dredges. *Id.* at 19-21, 126.

58. The agency acknowledged that further research is necessary to understand what turtle chains do to sea turtles. 70 Fed. Reg. at 30663. For example, the agency acknowledged that underwater video monitoring must be conducted. *Id.*

**B.    The Agency Has Not Quantified the Scope of the Problem That It Seeks to Address or the Benefits of Turtle Chains**

59. The agency cannot quantify how many sea turtles are harmed annually by scallop dredges or the benefits of turtle chains to sea turtles, assuming there are any benefits. *See* Oceana Comments at 3, 5-6.

60. The agency has no idea how many takes are actually occurring. The Biological Opinion estimates that 749 takes occur annually, but that estimate is based on an extrapolation of only observed takes of sea turtles (*i.e.*, sea turtles that were caught in sea scallop dredges, hauled to the surface, and then observed by an agency-approved at-sea observer). EA at 8, 18, 22, 60-63, 123, 140.

61.    The agency's own scientific experts have warned about this shortcoming. Specifically, they stated: "[A]ll our estimates of takes in the scallop dredge fishery should be considered as indices and not as estimates of the total take in the fishery. This is because we have not been able to observe takes underwater." Memorandum from John Boreman, Fisheries Service, to Patricia A. Kurkul, Fisheries Service (Mar. 6, 2006), at 1. If the agency were ever to consider all of the unobserved takes occurring underwater, its estimates likely would be much higher.

62.    Even if the agency could quantify the scope of the problem, it still could not quantify the benefits of turtle chains to sea turtles, assuming there are benefits. EA at 63-65, 123, 126; Draft EA at 54; 71 Fed. Reg. at 50366-67.

63.    The EA states that underwater takes may occur on the sea floor as the dredge is being towed or in the water column as the dredge is hauled to the surface. EA at 43. The agency concedes that turtle chains do not benefit sea turtles that are taken on the seafloor. *Id.* at 64. The agency claims that turtle chains will benefit only those sea turtles that are taken in the water column (i.e., sea turtles that are caught in the dredge as it is hauled from the seafloor up to the fishing vessel's deck). *Id.* at 64-65; 71 Fed. Reg. at 50367.

64.    The agency does not have a rational method for evaluating how many sea turtle takes occur in the water column and, for that matter, it does not even know for certain that such takes occur. 71 Fed. Reg. at 50366. Instead, the agency admitted that it "assumed" that 270 takes occur in the water column. EA at 65.

65.    It is conceivable that all takes occur on the seafloor while the dredge is being towed. Indeed, the agency admitted that it does not actually know whether takes occur on the

seafloor or in the water column.  *See* 71 Fed. Reg. at 50366 ("it is not known where sea turtles are encountering the gear").

66.    Thus, the agency itself admits that it cannot quantify the extent of the benefits of turtle chains, assuming there are any benefits.  EA at 123, 126; Draft EA at 54.

67.    The agency assumed that up to 36 percent of all takes occur in the water column. EA at 63, 65.

68.    But the record shows that the amount of time that dredges are hauled up through the water column is very small relative to the amount of time that they are towed on the seafloor. 71 Fed. Reg. at 50366.

69.    In prior administrative proceedings, the agency has assumed that scallop "vessels have gear on the bottom for 22 hours per day, or approximately 5 minutes for haul-back, dumping the catch, and resetting the gear for an hour-long tow."  Fisheries Service, *Framework Adjustment 14 Final Supplemental EIS* 150 (Feb. 28, 2001); *see also* EA at 63 ("Tows are often close to or over one hour in length . . .").

70.    Based on these figures, dredges spend about 92 percent of their time being towed on the sea floor (during which time there is no claimed benefit to sea turtles), and less than about 8 percent of their time being hauled to the surface (and that time includes dumping and resetting the dredge aboard the fishing vessel) — the only time during which, according to the agency, turtle chains will benefit sea turtles.

71.    Thus, implicit in the agency's analysis is the totally unjustified and unexplained assumption that the significantly less than 8 percent of the time that the dredge is in the water being hauled to the surface accounts for 36 percent of all takes.

**C.    The Agency Did Not Consider the Impact of Turtle Chains on Its Obligation under the Biological Opinion to Monitor Sea Turtle Takes**

72.    The agency's EA and rulemaking decision failed to consider that, by preventing takes from being observed, turtle chains will undermine measures that the agency already has deemed necessary to protect sea turtles.  *See* Oceana Comments at 3.

73.    The agency acknowledged that turtle chains will prevent sea turtles from being caught in the dredge.  EA at 23, 61-62.  As a consequence, at-sea observers will observe very few if any takes**.  *Monitoring Sea Turtle Bycatch in the Atlantic Sea Scallop Dredge Fishery with Chain Mats*, attached to Memorandum from John Boreman, Fisheries Service, to Patricia A. Kurkul, Fisheries Service (Mar. 6, 2006), at 1.

74.    In the Biological Opinion for the scallop fishery, the agency acknowledged that takes must be observed to protect sea turtles.  *See*, *e.g.*, BiOp at 80-81.  Specifically, observers are needed so the agency can determine whether to reinitiate consultation.  *Id.* at 82.

75.    The agency asked its scientific experts to examine various methods of monitoring takes of sea turtles by dredges modified with turtle chains.  Memorandum from John Boreman, Fisheries Service, to Patricia A. Kurkul, Fisheries Service (Mar. 6, 2006), at 1.

76.    Oceana commented to the agency that the rule would require monitoring of takes by underwater video camera.  Oceana Comments at 7.

77.    On information and belief, the agency did not ask its scientific staff to consider the alternative of monitoring takes by underwater video camera.  *See* Memorandum from John Boreman, Fisheries Service, to Patricia A. Kurkul, Fisheries Service (Mar. 6, 2006), at 1.

78.    The staff concluded after considering alternatives other than underwater video cameras that, "[a]fter considering a variety of different fishery-dependent and -independent approaches, our determination is that there is no approach that is entirely scientifically

adequate." *Id.* at 1.  In particular, the staff concluded that, if scallop dredges are equipped with turtle chains, at-sea observers would be an inadequate method for monitoring takes because "the method would likely provide few observed takes . . . and the method would not provide a take estimate at all comparable to the [Incidental Take Statement]" in the Biological Opinion. *Monitoring Sea Turtle Bycatch in the Atlantic Sea Scallop Dredge Fishery with Chain Mats*, attached to Memorandum from John Boreman, Fisheries Service, to Patricia A. Kurkul, Fisheries Service (Mar. 6, 2006), at 1.

79.    The staff reasoned that, "[b]ecause fewer turtles may actually be captured in chain mat dredges, take estimates will be less precise and perhaps inaccurate." *Id.*  Thus, the staff concluded: "we cannot recommend or support any one of these monitoring approaches." *Id.* at 1.

80.    The agency has therefore conceded that, if turtle chains are used as specified in the proposed action, the agency cannot fulfill its obligation under the Biological Opinion to obtain scientifically reliable estimates of sea turtle takes.

81.    The EA neither analyzes nor considers the failure of the final rule to comply with the Biological Opinion's terms and conditions imposing the observer requirement.

**D.    The Agency Did Not Properly Evaluate the Seasonal Closure Alternative**

82.    The agency admitted that a seasonal closure is the best alternative for protecting sea turtles, but rejected that alternative based on a faulty analysis of the economic impacts of a seasonal closure on fishermen.  *See* Oceana Comments at 8.

83.    The agency admitted that a seasonal closure is the best alternative for protecting sea turtles.  EA at 87, 92, 116.

84.    Using a "worst case scenario," however, the agency's economic analysis assumed that fishing effort would not shift and thus the closure would result in a total loss of all economic benefit derived from fishing in the closure area during the closure period.  *Id.* at 74, 118, 120.

85.     Fishing effort could shift as a result of a seasonal closure of the Mid-Atlantic region of the fishery in many ways. It could shift spatially, whereby fishing vessels would focus their fishing effort on different geographic regions of the fishery (*e.g.*, north of the Mid-Atlantic region). It could shift temporally by increasing effort in the Mid-Atlantic region during the season when fishing is permitted. Additionally, it could shift from the Atlantic Sea Scallop Fishery to a different fishery or even an economic activity other than fishing.

86.     The assumption in the agency's economic analysis that fishing effort will not shift contradicts the agency's assessment of environmental impacts.

87.     Specifically, in evaluating the "biological impacts" of a seasonal closure, the agency assumed that some or all fishing effort would shift. *Id.* at 87.

88.     Furthermore, it assumed that fishing effort would shift as a consequence of a seasonal closure when it evaluated impacts on seafloor habitat. *Id.* at 89.

89.     Indeed, the agency explicitly stated that it rejected the seasonal closure alternative in part because it believed that fishing effort would shift and such a shift might harm the environment. *Id.* at 121.

90.     The agency did not explain why it was willing, for the purposes of its environmental analysis but not for its economic analysis, to assume that fishing effort would shift as a consequence of a seasonal closure.

**FIRST CLAIM FOR RELIEF: THE FISHERIES SERVICE VIOLATED THE
ADMINISTRATIVE PROCEDURE ACT BECAUSE ITS DECISION TO ADOPT THE
TURTLE CHAINS RULE WAS ARBITRARY AND CAPRICIOUS**

91.     Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 90 in this claim for relief.

92.     The agency's decision to adopt the turtle chains rule was arbitrary and capricious and therefore violated the Administrative Procedure Act because the administrative record does

not show that the turtle chains rule will accomplish the agency's stated objective of protecting sea turtles.

93.    The agency has no idea how sea turtles interact underwater with dredges and therefore no idea whether turtle chains benefit sea turtles.

94.    The agency admitted that it cannot quantify the scope of the problem that it seeks to address or the benefits of the turtle chains rule, assuming there are any benefits.

95.    The agency failed to consider that, by preventing sea turtle takes from being observed by at-sea observers, turtle chains will undermine a measure that the agency itself found is necessary to protect sea turtles: specifically, monitoring takes using at-sea observers as required by the terms and conditions of the Biological Opinion.

96.    The agency failed to consider Oceana's comments suggesting the use of underwater video cameras to monitor turtle takes.

97.    Because the agency does not know for certain whether turtle chains will help or harm sea turtles, the agency should have erred on the side of caution by either adopting a seasonal closure or refraining from adopting any new rule.  Instead, the agency assumed that sea turtles will benefit from turtle chains which is essentially a best-case scenario given the facts that the agency had at its disposal.

98.    Additionally, the agency's decision to adopt the turtle chains rule was arbitrary and capricious, and therefore violated the Administrative Procedure Act, because the agency admitted that a seasonal closure is the best alternative for accomplishing the objective of protecting sea turtles, but rejected that alternative based on a faulty analysis of the economic impacts of a seasonal closure on fishermen, which irrationally assumed a worst-case scenario in which fishing effort would not shift to compensate for any perceived economic loss.

99.     Finally, given that the agency's own stated objective for conducting the rulemaking was to protect sea turtles rather than fisherman, it was irrational for the agency to assume a best-case scenario for the environmental impacts of turtle chains on sea turtles and a worst-case scenario for the economic impacts of a seasonal closure on fisherman.

100.    In sum, the analysis for the final rule was arbitrary and capricious, in violation of the APA, because it failed to consider important factors, was internally inconsistent, and was illogical.

**SECOND CLAIM FOR RELIEF: THE FISHERIES SERVICE VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT AND THE ADMINISTRATIVE PROCEDURE ACT BY FAILING TO PREPARE A RATIONAL ENVIRONMENTAL ASSESSMENT**

101.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 100 in this claim for relief.

102.    The agency violated the National Environmental Policy Act and the Administrative Procedure Act because its EA was grossly flawed.

103.    First, the Environmental Assessment is flawed because it does not contain evidence regarding how sea turtles interact underwater with dredges and therefore the agency has no idea whether turtle chains work.

104.    Second, the EA does not quantify the scope of the problem that the agency sought to address or the benefits, if any, of turtle chains.

105.    Third, the EA fails to consider that, by preventing takes from being observed, turtle chains will undermine measures in the Biological Opinion that the agency already has deemed necessary to protect sea turtles.

106.    Fourth, the agency failed to consider Oceana's comments suggesting the use of underwater video cameras to monitor turtle takes.

107.    Fifth, the EA is flawed because the agency's economic analysis of the seasonal closure alternative ignored the possibility that fishermen would shift their fishing effort.

108.    Because the analysis in the EA failed to consider important factors, was internally inconsistent, and was illogical, the agency failed to fulfill its obligations under the National Environmental Policy Act and the Administrative Procedure Act to conduct a rational environmental assessment.

**THIRD CLAIM FOR RELIEF: THE FISHERIES SERVICE VIOLATED THE
NATIONAL ENVIRONMENTAL POLICY ACT AND THE ADMINISTRATIVE
PROCEDURE ACT BECAUSE IT IRRATIONALLY ISSUED
A FINDING OF NO SIGNIFICANT IMPACT**

109.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 108 in this claim for relief.

110.    The agency's decision violated the National Environmental Policy Act and the Administrative Procedure Act because its FONSI was irrational in that it was based on a grossly flawed environmental assessment.

111.    The EA is flawed for all the reasons stated in paragraphs 101 through 108 of the second claim for relief.

112.    The agency therefore has violated the National Environmental Policy Act and the Administrative Procedure Act by issuing a FONSI based on a grossly flawed environmental assessment.

**PRAYERS FOR RELIEF**

113.    Enter a declaratory judgment that the Fisheries Service's rulemaking decision was arbitrary and capricious and therefore violated the Administrative Procedure Act because it was inconsistent with the agency's stated objective of protecting sea turtles.

114.    Enter a declaratory judgment that the Fisheries Service's EA did not comply with the National Environmental Policy Act and the APA because it was based on conjecture, failed to consider important issues, and irrationally assumed that fishing effort would not shift under the seasonal closure alternative.

115.    Enter a declaratory judgment that the FONSI did not comply with NEPA and the APA because it was based on an arbitrary and capricious EA.

116.    Enter an order setting aside and remanding the turtle chains rule, the EA, and the FONSI.

117.    Enter an order awarding Oceana its fees, expenses, and costs.

118.    Provide such other and further relief as the Court deems necessary, just, or proper.


DATED this 22nd day of September, 2006.

Respectfully submitted,

/s/ Eric A. Bilsky

_____

Eric A. Bilsky
DC Bar No. 433612
OCEANA, INC.
2501 M Street, NW
Washington, DC 20037-1311

Douglas C. Melcher
DC Bar No. 466148
OCEANA, INC.
2501 M Street, NW
Washington, DC 20037-1311